Filed 2/9/21  P. v. Sandoval CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICHARD STANLEY SANDOVAL,<br><br>    Defendant and Appellant. | G059291<br><br>(Super. Ct. No. 11ZF0125)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Maria D. Hernandez, Judge.  Affirmed.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

*        *        *

## INTRODUCTION

Defendant Richard Stanley Sandoval appeals from the postjudgment order denying his petition for resentencing under Penal Code section 1170.95. (All further statutory references are to the Penal Code.) Appointed appellate counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*), setting forth the facts of the case and requesting we review the entire record. Pursuant to *Anders v. California* (1967) 386 U.S. 738 (*Anders*), counsel identified potential issues to assist us in our independent review. We provided Sandoval 30 days to file written argument on his own behalf; he did not do so.

We agree with the recent holding of another panel of this court that "when an appointed counsel files a *Wende* brief in an appeal from a summary denial of a section 1170.95 petition, a Court of Appeal is not required to independently review the entire record, but the court can and should do so in the interests of justice." (*People v. Flores* (2020) 54 Cal.App.5th 266, 269.)

We have independently examined the entire record and appointed appellate counsel's *Wende/Anders* brief; we have found no reasonably arguable issue. (*Wende, supra*, 25 Cal.3d 436.) We therefore affirm.

## FACTS

We reiterate the summary of trial evidence set forth in our prior opinion *People v. Sandoval* (Feb. 4, 2016, G050543) (nonpub. opn.) (*Sandoval I*).

"I.

"TRIAL EVIDENCE OF THE CHARGED OFFENSE AND SPECIAL CIRCUMSTANCE ALLEGATION

"In 1984, 84-year-old Margaret Lenney owned an apartment building in Anaheim. She lived alone in one of the units and rented out the remaining ones.

"During the morning of September 23, 1984, in response to a call, Officer Paul Zavala of the Anaheim Police Department observed Lenney's body on the front porch of her apartment. Her shirt had been pulled up around her neck, exposing her breasts. Her pants and underwear had been pulled off.

"Zavala observed several injuries to Lenney's face and upper chest area. It appeared to Zavala that shoe print patterns were impressed on her face and chest area. That shoe print pattern appeared similar to a shoe print pattern in paint, which Zavala observed on the concrete in the area between Lenney's feet.

"The autopsy performed on Lenney's body showed she had suffered 'multiple blunt-type injuries' that included abrasions, contusions, and lacerations 'throughout the entire head and face' and on her neck and chest. Her skull had been fractured and she had intracranial hemorrhages at 'two separate levels' in her brain connected with 'significant blunt trauma' to her head.

"Every one of Lenney's ribs, 'on both sides, front and back,' was fractured, as was her spine. Her lungs were bruised. Lenney had suffered lacerations of the liver, spleen, and right lung. The injuries to Lenney's head and chest were consistent with those that might be inflicted by a 200-pound man using his foot to stomp on a woman's head and chest while she was lying on concrete. Lenney died from those multiple blunt traumatic injuries; her death 'would have taken some time' and was painful.

"There were also abrasions on both sides of Lenney's throat, which were consistent with 'manual compression that might cut off the air flow.' Lenney had abrasions on the inside of her left arm, which were consistent with her arms being forcibly held down.

"Lenney had suffered a rectal hemorrhage 'consistent with rectal penetration or insertional-type trauma.' There were two cuts on her left fingers consistent with defensive wounds that might be suffered in an attempt to ward off an attack.

"Detective Michael Lopez of the Anaheim Police Department also responded to Lenney's apartment on September 23, 1984, and saw the style of 'zigzag' shoe prints on Lenney's chest and also in paint on the walkway next to Lenney's body. He set out to find 'anybody who was associated with the painting of Margaret Lenney's apartment' and, based on his investigation, specifically sought to locate Sandoval.

"At 7:00 a.m. on September 24, 1984, Lopez and Detective Duane Goetz saw Sandoval walking on a street, but because they did not realize he was who the detectives were looking for, they did not contact him. When Lopez received information later that morning that Sandoval was wearing dark pants and a gray sweater, and saw Sandoval again at 8:00 or 8:30 a.m., he realized Sandoval was the man they were looking for and contacted him.

"Lopez told Sandoval that he and Goetz were investigating a homicide of an elderly woman. Sandoval said nothing and appeared unconcerned. Lopez asked Sandoval if he had done any painting for Lenney at her residence. At first, Sandoval stated he did not know what Lopez was talking about, but eventually acknowledged he had done some painting for her.

"Lopez asked Sandoval if he had been in contact with Lenney on Saturday night (September 22). Sandoval stated he was walking by Lenney's apartment when she came outside to ask him a question regarding some money she owed him for the paint job he had completed. Lopez asked Sandoval how he came to be in the area that morning when the detectives contacted him. Sandoval said he had just arrived in the area by bus, shortly after 8:00 a.m. When Lopez confronted Sandoval with the information that he and Goetz had seen Sandoval in the area an hour earlier, Sandoval responded, 'I don't give a fuck what you think.' Lopez arrested Sandoval.

"During the booking process, a small pocketknife with some blood on it was found among Sandoval's personal property. As DNA testing was not available at the time, charges were not filed against Sandoval in 1984, and he was released.

4

"Later testing of the blood on the pocketknife showed Lenney's DNA profile matched the major contributor of the DNA found in the sample. That DNA profile could be expected to occur randomly in fewer than one in one trillion unrelated people. Sandoval's DNA profile matched the DNA of the minor contributor of the sample; that profile would be expected to occur randomly in fewer than one in 40 billion people.

"Swabs had been collected from Lenney's vaginal area and from 'white material' that '[l]ooked like it was dried fluid,' which was collected from the ground underneath Lenney's buttocks. Examination of the swabs did not show the presence of spermatozoa. Danielle Wieland, a DNA analyst working for the Orange County crime laboratory, performed 'Y chromosome D.N.A. typing' of DNA contained in the substances collected on the swabs. She testified that 'Y chromosome typing is a special type of typing that's used to only copy or look at the Y or the male chromosome. This is used usually in cases where there is an excessive or large amount of female D.N.A., and the interest is solely in the male D.N.A. present. It will not type or copy any of the female D.N.A., it will only type the male D.N.A.' (Wieland explained that in instances 'where the male doesn't ejaculate and there is no spermatozoa,' there is '[t]ypically, less' DNA contributed by the male in a sample collected from a vaginal swab.)

"Wieland stated that Y chromosome testing showed the 'Y haplotype' found in the material collected from the vaginal swab taken from Lenney matched Sandoval's haplotype. '[A]pplying a 95-percent confidence interval,' she stated such a Y haplotype occurs in fewer than one in 5,000 unrelated people. She further stated that the substance collected from the dried fluid under Lenney's buttocks contained 'a very low level partial Y haplotype,' consistent with Sandoval's Y haplotype.

"Wieland could not identify the source (e.g., a particular type of body fluid) from which the Y haplotype was recovered. She stated that with low amounts of DNA, she would not expect the source to be of a type that would contain a large amount of

5

DNA, such as blood or a significant amount of saliva. She explained that it was possible such 'touch' DNA could be found in a vagina 'if a man inserted his penis but did not ejaculate' or if a man inserted his finger into the vaginal area.

"II.

"TRIAL EVIDENCE REGARDING SANDOVAL'S PRIOR AND SUBSEQUENT RAPE OFFENSES

"The prosecution introduced evidence that in 1981, Sandoval raped Irene R. Irene R. testified that Sandoval, an acquaintance, had told her he was going to sell his car and wanted her to take a look at it. While they were in the car, Sandoval started kissing her neck. While she tried to resist his advances, he removed her shorts, touched her genital area with his hands, and inserted his penis into her vagina. The record does not reflect whether Sandoval was arrested or criminally prosecuted for that offense.

"In November 1985, Sandoval was found guilty of three counts of forcible rape, one count of penetration with his fingers, one count of oral copulation, one count of false imprisonment, and one count of sexual battery, against Joyce D., all committed in July 1985; the jury also found true that Sandoval used a knife in the commission of some of those offenses, including two of the rape offenses. The trial court in that case sentenced Sandoval to 24 years in prison."

PROCEDURAL HISTORY

Sandoval was found guilty by a jury of first degree murder. The jury found true the special circumstance allegation that the murder was committed during the commission or the attempted commission of a rape. The trial court sentenced Sandoval to life in prison without the possibility of parole. Sandoval appealed.

In *Sandoval I*, we affirmed the judgment of conviction, holding substantial evidence supported both the jury's true finding of the special circumstance allegation and the trial court's felony-murder jury instruction.

6

In September 2019, Sandoval filed a petition seeking resentencing under section 1170.95, which was enacted by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) and took effect on January 1, 2019. The trial court summarily denied the petition.

At the hearing attended by Sandoval's counsel, the court explained "it is very clear to this court Mr. Sandoval was the sole defendant, was the rapist, murderer in this case of an 84-year-old victim who was bludgeoned and traumatized during the rape and murder in this case. [¶] So, without going into a whole discussion on [Senate Bill No.] 1437, which we all know well, it really did address the restrictions of ability to prosecute accomplices, the elimination of our natural and probable consequence doctrine. None of those Mr. Sandoval falls in. [¶] So for those reasons the court is going to summarily deny the prima facie." Sandoval appealed.

ANALYSIS

In the *Wende/Anders* brief filed in the instant appeal, appointed appellate counsel suggests we consider whether: (1) the court erred by summarily denying Sandoval's petition under section 1170.95 because Sandoval had made a prima facie showing; (2) Sandoval had a right to be present at the prima facie hearing; and (3) the trial court's denial of the petition constituted prejudicial error in violation of Sandoval's state and federal due process rights. None of counsel's suggestions constitutes an arguable issue.

In *People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*), the California Supreme Court explained: "Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.] [¶] To further that purpose, Senate Bill 1437

7

added three separate provisions to the Penal Code.  First, to amend the felony-murder rule, Senate Bill 1437 added section 189, subdivision (e):  'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven:  [¶] (1) *The person was the actual killer*.  [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.'"  (Italics added.)

The Supreme Court continued:  "Second, to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) (section 188(a)(3)):  'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime.'" (*Gentile, supra*, 10 Cal.5th at pp. 842-843.)  Because Sandoval was not prosecuted under the natural and probable consequences doctrine, it is not an issue here.

"Third, Senate Bill 1437 added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above." (*Gentile, supra*, 10 Cal.5th at p. 843.)

Subdivision (c) of section 1170.95 refers to a prebriefing, initial prima facie review of information in the record of conviction and the court file to preliminarily determine whether a petition is statutorily eligible for relief as a matter of law.  (*People v. Verdugo* (2020) 44 Cal.App.5th 320, 329-330, review granted Mar. 18, 2020, S260493).)  The trial court may review the complaint, the information or indictment, the verdict form or the documentation for a negotiated plea, and the abstract of judgment.  (*Ibid*.)  A court

8

of appeal's opinion from a petitioner's direct appeal is part of the record of conviction. (*Id.* at p. 333; see *People v. Palacios* (2020) 58 Cal.App.5th 845, 856; *People v. Lewis* (2020) 43 Cal.App.5th 1128, 1137-1138, review granted Mar. 18, 2020, S260598) [in determining whether a petitioner made a prima facie showing, the court may review the record of conviction, which includes the opinion in a petitioner's direct appeal].) If these documents reveal ineligibility for relief, the trial court can dismiss the petition. (*People v. Verdugo, supra*, 44 Cal.App.5th at p. 330; see *People v Palacios, supra*, 58 Cal.App.5th at p. 859.)

Here, the jury returned a verdict of guilty on the first degree murder charge, finding that Sandoval unlawfully and with malice aforethought killed Lenney. Our summary of the trial evidence in *Sandoval I* shows the brutally violent manner in which Sandoval killed Lenney and that he did so alone. It is true the jury found Sandoval to have killed Lenney in the commission or attempted commission of a rape and that the jury was instructed on felony murder. Sandoval is nevertheless ineligible for relief under section 1170.95 because he was Lenney's killer. Because Sandoval cannot make a prima facie showing under section 1170.95, the trial court did not err by summarily denying his petition on that basis.

Appellate courts have held that a petitioner is not entitled to the appointment of counsel "unless and until the court makes the threshold determination that petitioner 'falls within the provisions' of the statute." (*People v. Lewis, supra*, 43 Cal.App.5th at p. 1140; see *People v. Verdugo, supra*, 44 Cal.App.5th at pp. 332-333.) The record shows, however, that Sandoval was represented by counsel at the prima facie hearing on his section 1170.95 petition. Sandoval did not have the right to be personally present at the prima facie hearing; no legal authority states otherwise. The record does not show Sandoval's state or federal due process rights were violated.

We have reviewed the record in accordance with *Wende* and *Anders*, and we find no arguable issues on appeal. (*People v. Kelly* (2004) 40 Cal.4th 106, 110, 120, 124.)

DISPOSITION

The postjudgment order is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.